Filed 12/6/21  P. v. Hernandez CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> FRANKIE RUDY HERNANDEZ, <br><br> Defendant and Appellant. | F077379 <br><br> (Super. Ct. No. VCF313733) <br><br> **OPINION** |

## THE COURT*

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, John W. Powell, Darren K. Indermill, and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Poochigian, Acting P. J., Smith, J. and Meehan, J.

## INTRODUCTION

Appellant Frankie Rudy Hernandez was convicted by jury of second degree murder (Pen. Code,[1] §§ 667, 187, subd. (a)). In addition, the jury found true enhancements alleging Hernandez personally and intentionally discharged a handgun in the commission of the offense, proximately causing the death of another human being (§ 12022.53, subds. (b)-(d)), and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct of gang members (§ 186.22, subds. (b)(1)(A) & (b)(5)).

Hernandez was sentenced to an indeterminate term of 40 years to life in state prison. Hernandez received 15 years to life on his conviction of second degree murder with a consecutive prison term of 25 years to life for the firearm enhancement. The court ordered this term to run consecutive to a four year prison sentence following Hernandez's conviction in an unrelated case. In addition, the court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a victim restitution award in the amount of $5,000 (§ 1202.4, subd. (f)), a $10,000 parole revocation restitution fine (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 conviction assessment fee (Gov. Code, § 70373, subd. (a)(1)).

On appeal, Hernandez raised the following contentions: (1) the admission of the gang expert's testimony as to the primary activities of the Northern criminal street gang violated *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); (2) the admission of the expert's testimony as to the predicate offenses of the gang violated *Sanchez*; (3) his case should be remanded for an exercise of discretion by the trial court to consider striking the firearm use enhancement applied to his sentence; (4) he is entitled to a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), so he can prepare a record for his

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

future youth offender parole hearing; and (5) he is entitled to a hearing on his ability to pay the restitution fine imposed pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We originally issued an opinion on December 18, 2020, affirming Hernandez's judgment of conviction. On January 27, 2021, Hernandez filed a petition for review in the California Supreme Court. The Supreme Court granted review (*People v. Hernandez*, review granted Mar. 24, 2021, S266862) and deferred briefing until the high court decided *People v. Garcia* (S250670) and *People v. Valencia* (S250218). On July 1, 2021, the Supreme Court decided *Garcia* and *Valencia* in a joint opinion, *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*). On September 15, 2021, the Supreme Court transferred the instant case back to this court with directions to vacate our opinion and to reconsider in light of *Valencia*. After consideration of the parties' supplemental briefs, we conclude the gang enhancement applied to Hernandez's sentence (§ 186.22, subd. (b)) must be reversed.

## STATEMENT OF FACTS

On August 22, 2013, at approximately 10:00 p.m., David Munoz and Isaac Vasquez were walking on the Santa Fe trail in the City of Tulare when they encountered several individuals standing around a parked vehicle. One of the men asked Munoz and Vasquez who they were. Vasquez replied, "Bandit." One of the men responded, "West Side Tula," a reference to a criminal street gang in Tulare. They asked Munoz and Vasquez, " 'How's that Norte life?' " Munoz and Vasquez continued walking and did not respond. They walked half a block further when a man emerged from the shadows.

The man asked Vasquez, " 'Hey what's your name?' " He asked, " 'You're Bad Boy, aren't you?' " Vasquez replied, " 'No' " but the man insisted, " 'Yeah, you are him.' "

3.

Moments later, the man drew a gun and began firing upon Vasquez. Vasquez and Munoz ran in different directions. Munoz heard approximately seven more shots as he was running. Although Munoz escaped, Vasquez was shot three times.

Officer Richmond with the Tulare Police Department responded to the scene. Several people pointed Officer Richmond to the front yard of a nearby home where Vasquez was lying down. Vasquez was bleeding heavily. When questioned, Vasquez stated a "Northerner gang member" had shot him, but he refused to identify the individual who had shot him. Vasquez asked Officer Richmond how bad he thought his injuries were. Officer Richmond told Vasquez he thought Vasquez was going to die.

After hearing Officer Richmond's response, Vasquez told Officer Richmond someone named Frankie had shot him. Vasquez explained he was shot because he was a Northerner dropout and that Frankie was a Northerner. Vasquez lost consciousness shortly thereafter. He died as a result of his injuries.

During their investigation, police discovered a watch on the ground near the trail and swabbed it for DNA. It was taken into evidence.

An autopsy of Vasquez's body was performed several days later. The autopsy revealed Vasquez had been shot in the arm, back, and buttocks. The pathologist also noted the presence of blunt force trauma on the back of Vasquez's head and incised wounds on his scalp.

A few days after the shooting, Munoz was detained during a traffic stop. He went to the police department and gave a statement about the shooting. Munoz described the shooter as a light-skinned, Hispanic male, approximately five feet seven inches in height. When he was shown a photographic lineup of six men, Munoz identified an individual by the name of Frankie B. as the suspect. He was not positive the individual whom he had identified was the shooter.

Nearly two years later, Munoz was shown another photographic lineup. Munoz said the men in two photos resembled the shooter. One of these men was appellant Frankie Rudy Hernandez.

In October 2013, Hernandez was detained with Patrick Ragland and Adrian Meraz following a traffic stop. Hernandez, Ragland, and Meraz were being investigated for a string of burglaries, and a DNA swab was performed on Hernandez during the course of the investigation. DNA found on the watch that was recovered on the night of Vasquez's murder matched DNA that was collected through a buccal swab of Hernandez's cheek.

In 2015, Sergeant Jon Hamlin and Detective Ray Guerrero spoke to Hernandez about the fact that his DNA had been found at the scene of Vasquez's murder. Hernandez denied knowing Vasquez, he offered no specific details about his whereabouts at the time of the murder, and he did not have an explanation for the presence of his DNA on the watch police recovered on the night of the shooting.

**The Informants**

***Moses Vela***

Moses Vela was a former Norteño gang member who was personally acquainted with Hernandez. Vela also knew Vasquez.

On December 10, 2014, while Vela was in custody, he spoke with Guerrero about the murder of Vasquez, whom Vela knew as "Bad Boy." His statements were recorded, and transcripts of his statements were given to the jury at Hernandez's trial.

On the night of the murder, Vela claimed he had been walking to Hernandez's house to pick up a firearm. As Vela neared Hernandez's home, he heard at least several gunshots. Vela looked in the direction of the gunfire and saw Hernandez running from the east, holding a gun like a hammer. Hernandez made statements to the effect that he had gotten someone. Anticipating the arrival of police, Vela fled.

5.

Vela encountered Hernandez again while Hernandez was in jail for some burglaries. Hernandez told Vela that he had killed Vasquez as punishment for dropping out of the Norteño gang.

Although Vela claimed he "was just making up stories," and stated he was actually locked up when Vasquez was murdered, he admitted he had told Guerrero that Hernandez had killed Vasquez because Vasquez was a Norteño dropout. Vela told Guerrero that Hernandez was a Norteño squad leader.

### Ralph Padilla Zavala

Ralph Padilla Zavala became acquainted with Vasquez while they were both incarcerated. Like Vasquez, Zavala was a Northerner dropout.

Zavala was also familiar with Hernandez, whom he had met during his incarceration at Donovan State Prison. Zavala and Hernandez were both from Tulare County and often socialized with one another in the prison yard. On one occasion, Hernandez spoke with Zavala about the murder of Vasquez.

The district attorney's office subsequently received a letter from Zavala stating Hernandez had provided him with a step-by-step account of Vasquez's murder. As a result of this letter, Sergeant Hamlin and Guerrero spoke to Zavala. Zavala's statements were recorded, and transcripts of his interview were provided to the jury.

Hernandez told Zavala he had been at home smoking marijuana with a fellow gang member when he saw Vasquez walking nearby. When Hernandez and his companion went outside and confronted Vasquez, a physical confrontation ensued. During the confrontation, Hernandez claims his companion pulled out a firearm and proceeded to pistol whip Vasquez. Vasquez was eventually able to free himself. He was shot three times when he fled the scene. Hernandez initially told Zavala that his companion had fired the fatal shots. However, in a subsequent conversation, Hernandez admitted he had been the one who had produced the firearm, pistol whipped Vasquez, and shot Vasquez while he was attempting to flee.

Hernandez also told Zavala his watch had fallen off during the confrontation and was later found at the scene by police. Hernandez expressed concern that the watch contained his DNA.

At trial, Zavala did not recall many of the statements he had made to Sergeant Hamlin and Guerrero. He claimed he was under the influence at the time he spoke to them.

**The Gang Evidence**

Guerrero participated in the investigation of Vasquez's murder. He also testified at Hernandez's trial as an expert on criminal street gangs.

Guerrero worked in the gang unit in the City of Delano from 2011 to 2012. In 2012, he began working for the Tulare Police Department, where he was subsequently promoted to the gang unit. Over the course of his career, he worked on numerous gang-related crimes, ranging from petty theft to homicide. Guerrero had studied the Northern street gang active within the City of Tulare. He also had contact with numerous former and active gang members throughout the course of his investigations during consensual encounters and arrests.

According to Guerrero, there are at least 250 Norteño gang members throughout the City of Tulare, and even more scattered throughout the county. The Norteño street gang commonly uses the number 14, which is symbolic of the letter N, which pays allegiance to the Nuestra Familia. Guerrero opined the Norteños are a street gang, whereas Nuestra Familia is a prison gang. The Norteños also use common signs and colors, including: X4, the huelga bird, and the color red. They often wear San Francisco 49ers clothing or San Francisco Giants apparel. Norteños generally display the same gang tattoos, such as four dots, Tula, WST, EST, Norte, Norteño, and Norteño for life.

Guerrero explained the Northerners in Tulare commonly operate within subsets. These subsets include: East Side Tula, West Side Tula, West Side Norteño Gangsters,

West Side Locs, and the Van Klen Posse. The subsets often conduct operations together under the same overarching Northern umbrella.

With respect to the instant case, Guerrero opined that at the time of Vasquez's murder, Hernandez was an active Norteño gang member and that he had committed the murder for the benefit of the Northern gang. Guerrero explained that Vasquez was a dropout, and dropouts are commonly targeted by the gang. Further, Vela had told Guerrero that Hernandez was a squad leader. Guerrero explained that in gang culture, a squad leader is tasked with maintaining control over a given area operated by the gang, and with taking care of dropouts. Guerrero opined the murder would benefit the gang because killing a dropout would bring respect to the gang by fulfilling its "blood in/blood out oath."

In opining that Hernandez was active gang member Guerrero relied upon multiple factors. Guerrero had personally observed numerous gang-related tattoos on Hernandez, including the word "East" tattooed on his right wrist and the word "Tula" on his right forearm. Guerrero explained these tattoos represent the East Side Tula subset of the Northern street gang. Hernandez also had a 49ers tattoo on his neck and on his left shoulder, as well as the letters "SF" tattooed on his left hand.

When Guerrero interviewed Hernandez in prison, Hernandez admitted he associated with Northerners. Hernandez was able to identify other individuals whom he knew to be Northern gang members, including Chris Burris, a high-ranking Northerner in Tulare County. According to Guerrero, this was significant because low-ranking gang members are not permitted to associate with high-ranking members.

Guerrero had also previously met Hernandez when Guerrero was counseling at-risk youth. Hernandez had just begun to get involved in gangs and Guerrero tried to steer him to a different path. In forming his opinion, Guerrero stated he had also relied upon multiple prior contacts described by officers who testified at Hernandez's trial.

8.

In October 2009, Detective Espinosa contacted Hernandez while Espinosa was searching for a wanted suspect. Hernandez was in the company of two other known Norteños, William Moreno and Daniel Ramirez. During a search of the vehicle, Espinosa located a firearm under Hernandez's seat. Espinosa heard Moreno tell Hernandez " '[t]his is your first offense. You need to take this.' " Moreno told Espinosa that Hernandez had something to tell him. Hernandez claimed the firearm was his. He was ultimately charged with possession of the firearm.

Between 2007 and 2013, Officer Jess Guzman with the Fresno Police Department contacted Hernandez multiple times. When asked about his gang status, Hernandez admitted to being a Northerner multiple times. Officer Guzman was also present during the October 2009 incident where Hernandez was detained. Hernandez told Officer Guzman that Moreno had told him to take the rap for the gun. Moreno was a higher-ranking gang member.

Officer Jacob Adney with the Tulare Police Department described two prior field interviews with Hernandez. In February 2012, during a consensual encounter, Adney contacted Hernandez with George Moreno, another known Northern gang member while the two were at a known Northern hangout. Hernandez and Moreno were in possession of gang paraphernalia. Adney also observed an Aztec tattoo on Hernandez, which is common among Norteño gang members. Hernandez told Adney he was a Norteño gang member.

In October 2013, Officer Adney contacted Hernandez again during a traffic stop. Hernandez was in the company of Adrian Meraz, a known Norteño gang member. During the contact, Hernandez admitted he was a Norteño gang member.

In February 2013, Detective Espinosa contacted Hernandez in the City of Tulare. Hernandez was in the company of George Sanchez, a known Norteño gang member.

**DISCUSSION**

**I.    Admission of the Gang Expert's Testimony as to the Predicate Offenses of the Northern Gang**

Following our Supreme Court's decision in *Valencia*, Hernandez contends the gang expert related case-specific, testimonial hearsay during his testimony about the predicate offenses of the Northern gang.  (§ 186.22, subds. (b), (e), (f).)  According to Hernandez, this testimony violated *Sanchez*, *supra*, 63 Cal.4th 665 and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Hernandez further contends trial counsel rendered ineffective assistance of counsel by failing to object to Guerrero's testimony at trial.

We conclude the record shows that Guerrero related case-specific hearsay during his testimony about the predicate offenses.  This testimony was hearsay not shown to be within an exception.  Upon this record, we are persuaded that trial counsel's failure to object to the admission of this evidence under *Sanchez* or *Crawford* constitutes ineffective assistance of counsel.  We therefore reverse the gang enhancement (§ 186.22, subd. (b)) applied to Hernandez's sentence.

**A.    Background:  Testimony Relevant to the Primary Activities and Predicate Offenses of the Northern Gang**

With respect to the primary activities of the Northern gang, Guerrero testified Northern gang members commit the following crimes:  "assaults on rival gang members, burglaries, robberies," as well as "[w]itness intimidation, homicide, [and] attempted homicide."  Guerrero's opinion was presumably based upon multiple sources.

Over the course of his career, Guerrero personally investigated numerous gang crimes, including "homicide and attempted homicide."  In addition to his experience, Guerrero has undergone approximately 300 hours of training relating to criminal street gangs, including Northern criminal street gangs.  Guerrero also learned about the

Northern gang from speaking to active gang members, interviewing dropouts, and utilizing confidential informants.

To prove the gang had committed a pattern of criminal activity, Guerrero described two predicate offenses by subjects whom he had opined were active members of subsets of the Northern gang. The first offense had occurred on March 31, 2011, when Paul "Plucky" Peña, an East Side Tula gang member, shot a member of a rival gang in the City of Tulare. On this date, responding officers located three victims who had suffered gunshot wounds. During their investigation, police learned the three victims were Southern criminal street gang members. Peña was identified as the shooter. He asked the victims whether they "banged." When one of them responded, "Wicked," a term referencing a Sureño subset, Peña produced a firearm and discharged it at the victims four or five times. Ryan Pedron, a West Side Tula gang member, admitted he had supplied Peña with the firearm.

Peña was convicted of attempted homicide with a criminal street gang enhancement. Guerrero supplied certified copies of Peña's conviction for the offense he had described, which was admitted into evidence without objection.

The second predicate offense occurred on March 9, 2011 in the City of Tulare. Stefan Torres was with Mandon Torres, Gabriel Minjares, and Joey Valdez, when they noticed two male subjects, one of whom was wearing a blue tank top. Stefan Torres produced a firearm and began shooting at the two subjects and their residence. The victims identified all four subjects pursuant to an in-field lineup.

A text message in Minjares's phone stated, "Little homie just bucked on some scraps." Guerrero explained that the text referenced Stefan Torres shooting at Southern gang members.

All four men were subsequently convicted of attempted homicide, and the jury found true enhancements alleging the crime was committed for the benefit of a criminal street gang. Guerrero supplied certified copies of Mandon Torres's conviction, which

11.

was admitted into evidence. Guerrero opined Valdez was a member of the West Side Loco subset of the Northern gang, and his codefendants were members of the West Side Tula subset.

Guerrero was not personally involved with the investigation of either crime underlying the predicate offenses that he had discussed. Although Guerrero was not personally familiar with Paul Peña; he was familiar with Stefan Torres, one of the three gang members who had assisted Mandon Torres in the commission of the second predicate offense.

Guerrero was able to form an opinion about the active gang status of Peña and Mandon Torres because he had researched their backgrounds by looking at his agency's report system, contacting other agencies, and conducting a records' check of the subjects through different databases.

## B.     Relevant Law

### i.     *Gang Enhancement Charged Under Section 186.22, Subdivision (b)(1): General Principles*

A gang enhancement under section 186.20 et seq., commonly known as the Street Terrorism Enforcement and Prevention Act (the STEP Act), has two prongs—the gang-related crime prong, and the specific intent prong. (*People v. Albillar* (2010) 51 Cal.4th 47, 60, 64-65.) Under the first prong, the People must prove the defendant committed the underlying crime "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) "The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 948.)

In addition, to support the gang enhancement, the People must also prove the existence of the criminal street gang. A " 'criminal street gang' " is defined as "any ongoing organization, association, or group of three or more persons, whether formal or

informal, having as one of its primary activities the commission of one or more criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of [section 186.22] subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

The " 'primary activity' " element requires the commission of the specified crimes be " 'one of the group's "chief" or "principal" occupations' " as opposed to the occasional commission of those crimes by the group's members. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.) The testimony of a gang expert—founded upon "his personal experience in the field gathering gang intelligence, contacting gang members, and investigating gang-related crimes"—may supply an adequate factual basis for the primary activities of a gang. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465.)

Additionally, "[e]vidence of both past offenses and the currently charged offenses may be considered in determining whether one of the primary activities of the gang is committing one or more of the offenses enumerated in [subdivision (e) of section 186.22]." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1068.)

To prove the gang's members have engaged in a "pattern of criminal activity" within the meaning of the gang enhancement statute, the People are required to prove the gang's members "individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) Section 186.22, subdivision (e) defines a " 'pattern of criminal gang activity' " as "the commission of, attempted commission of, conspiracy to commit, ... or conviction of two or more of the [enumerated] offenses, provided ... the offenses were committed on separate occasions, or by two or more persons" within a statutorily defined time period. (§ 186.22, subd. (e). These offenses are commonly referred to as "predicate offenses."

13.

### ii. Sanchez and Valencia

In *Sanchez*, our Supreme Court held that a gang expert cannot testify to case-specific facts asserted in hearsay statements unless such facts are within the expert's personal knowledge or independently proven by admissible evidence. (*Sanchez, supra,* 63 Cal.4th at p. 686.) Prior to *Sanchez*, expert witnesses could testify about out-of-court statements upon which they had relied in forming their opinions, even if those statements were inadmissible hearsay. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618, disapproved of on other grounds by *Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13 ["So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony"].) The justification for this broad exception was that "statements related by experts are not hearsay because they 'go only to the basis of [the expert's] opinion and should not be considered for their truth.' " (*Sanchez,* at pp. 680-681.)

*Sanchez* held that a trier of fact must necessarily consider expert basis testimony for its truth in order to evaluate the expert's opinion, which implicates the hearsay rule and the right of confrontation. (*Sanchez, supra*, 63 Cal.4th at p. 684.) Thus, "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.... If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686, fn. omitted.)

Our Supreme Court held that while an expert can relate background information based upon his or her "general knowledge in his field of expertise" the expert is not permitted to relate case specific facts of which he or she has no personal knowledge. (*Sanchez, supra*, 63 Cal.4th at p. 676.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried."

14.

(*Ibid.*)  And, unless subject to a statutory exception, such hearsay is inadmissible under state law.  (*Id*. at pp. 674, 698; Evid. Code, § 1200, subd. (b).)

In *Valencia,* our Supreme Court clarified that facts supporting the predicate offenses of a particular criminal street gang are distinct from background information about the gang, such as information about the gang's "territory, symbols, and operations, that are generally accepted as true by experts in the field."  (*Valencia, supra*, 11 Cal.5th at p. 835.)  "[T]he particular facts offered to prove predicate offenses as required by the STEP Act are not the sort of background hearsay information about which an expert may testify.  Competent evidence of those particulars is required."  (*Id*. at p. 839.)  Thus, "[w]ithout independent admissible evidence of the particulars of the predicate offenses, the expert's hearsay testimony cannot be used to supply them.  In the absence of any additional foundation, the facts of an individual case are not the kind of general information on which experts can be said to agree."  (*Id.* at p. 838.)

### iii.    *Forfeiture/Ineffective Assistance of Counsel*

Hernandez concedes his trial counsel failed to object to the expert's challenged testimony under *Sanchez*.  *Sanchez* was decided 18 months prior to Hernandez's criminal trial, yet trial counsel made no reference, at any point, to *Sanchez* or *Crawford*.  Consequently, Hernandez argues his trial counsel was constitutionally ineffective for failing to preserve this issue for appellate review.

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' "  (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686 (*Strickland*).)  To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that:  (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Id.* at pp. 694, 687-688.)  As discussed further below, we conclude that Hernandez has met his burden of proof under both prongs of *Strickland*.

### a. Trial Counsel's Representation Fell Below an Objective Standard of Reasonableness

With respect to the first prong of *Strickland*, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland, supra,* 466 U.S. at p. 688.) In evaluating counsel's actions, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Ibid*.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

The first published case to address the issue now raised by Hernandez was *People v. Ochoa* (2017) 7 Cal.App.5th 575 (*Ochoa*). *Ochoa* held that facts pertaining to the predicate offenses are necessarily case specific, and therefore subject to the requirement that the expert not relate hearsay statements in testifying about those facts. (*Id.* at pp. 583, 588-589.) *Ochoa* was filed one year before Hernandez's trial commenced. However, at no point before trial in a motion in limine, or during trial pursuant to an objection, did trial counsel so much as reference *Sanchez*.

At the time of Hernandez's trial, there was a split of authority as to whether a gang expert's testimony concerning the predicate offenses of the gang entailed case-specific facts as contemplated by *Sanchez*, or whether such testimony constituted only general background information. (See *Ochoa, supra,* 7 Cal.App.5th at pp. 583, 588-589 [expert's hearsay testimony regarding predicate crimes may constitute inadmissible, case-specific testimonial hearsay within the meaning of *Sanchez*]; accord, *People v. Lara* (2017) 9 Cal.App.5th 296, 337; but see, *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411 [expert's testimony as to the subjects of the predicate offenses constituted "background information"], disapproved by *Valencia, supra,* 11 Cal.5th at p. 839, fn. 17.)

Because there was a split of authority at the time of Hernandez's trial, the lower court was free to follow the decision it found to be the most persuasive. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456 [when "appellate decisions are in conflict" a "court exercising inferior jurisdiction can and must make a choice between the conflicting decisions"].) Thus, nothing suggests an objection by trial counsel would have been futile. Moreover, as the objection could only have likely benefited Hernandez, the lack of an objection does not appear to be the product of some unarticulated trial strategy by counsel. (*Strickland, supra,* 466 U.S. at p. 689.)

On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of ineffective assistance of counsel] unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.) The People do not proffer a satisfactory explanation for counsel's failure to object to the gang expert's testimony as the predicate offenses, nor can we independently offer such an explanation.

The majority of Guerrero's testimony was clearly hearsay not shown to be within an exception. Because the basis for an objection under *Sanchez* or *Crawford* would have been clear based upon legal precedent in existence at the time of Hernandez's trial (see *Ochoa, supra*, 7 Cal.App.5th at pp. 583, 588-589), and there is no explanation for trial counsel's failure to object, we conclude trial counsel's failure to object fell below an objective standard of reasonableness. (*Strickland, supra,* 466 U.S. at p. 688.)

### b. Prejudice

The second prong under *Strickland* requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.) "How readily deficient performance undermines confidence in the

trial's outcome will in part depend on the strength of the trial evidence on any decisive points. A 'verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' " (*In re Gay* (2020) 8 Cal.5th 1059, 1087.)

Excluding the inadmissible hearsay related by Guerrero during his testimony about the gang's predicate offenses, the People concede there is insufficient admissible evidence upon this record to establish the pattern of criminal gang activity, a prerequisite to proving the gang enhancement (§ 186.22, subd. (b)). Although the certified records of conviction for Mandon Torres and Paul Peña were admitted into evidence at trial, these records do not show which criminal street gang to which they claimed membership. Additionally, without the underlying facts of the predicate offenses, that were based upon hearsay, the evidence was insufficient to establish an associational or organizational connection between the gang subsets that committed the predicate offenses, and the overarching gang Hernandez had acted to benefit. (See *People v. Prunty* (2015) 62 Cal.4th 59.)

Because the existence of the Northern criminal street gang was based almost entirely on inadmissible evidence, counsel's failure to object to Guerrero's testimony undermines our confidence in the outcome.[2] We therefore conclude the gang enhancement (§ 186.22, subd. (b)(1)) applied to Hernandez's sentence must be reversed. "As a general rule, it is well established that if the defendant secures on appeal a reversal of his conviction based on trial errors other than insufficiency of evidence, he is subject to retrial." (*People v. Hernandez* (2003) 30 Cal.4th 1, 6.) As the issue here was the

---

[2] At the time of Hernandez's trial, the crimes of which he was ultimately convicted could have qualified as evidence of one of the predicate offenses. (*People v. Loeun* (1997) 17 Cal.4th 1, 10.) However, the jury was never instructed on this point. In any event, Hernandez's crime supplies evidence of only one of the two predicates required to establish a pattern of criminal activity. (§ 186.22, subd. (e).)

admissibility of the evidence used to prove the predicate offenses, and not the sufficiency of the evidence, we conclude the People may retry the gang enhancement.

## DISPOSITION

The gang enhancement (§ 186.22, subd. (b)) is reversed. The case is remanded back to the trial court for further proceedings. If the prosecution elects not to retry Hernandez on the gang allegation within 60 days after the filing of remittitur, under section 1382, subdivision (a)(2), the trial court shall resentence him. At sentencing or resentencing, Hernandez is entitled to request a hearing on his ability to pay court-imposed fines, fees, and assessments, and the trial court shall consider whether to exercise its section 1385 discretion to impose an additional term for the firearm use enhancement. (§ 12022.53, subds. (b)-(d).) In all other respects, the judgment is affirmed.[3]

---

[3] Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), we are required to report our reversal of the judgment for ineffective assistance of counsel to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against trial counsel. We shall do so upon issuance of the remittitur in this case.

19.